IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Berchtold Corporation, ) | Civil Action No. 2:14-cv-00774-RMG |
| ) | |
| Plaintiff, ) | |
| ) | **ORDER** |
| vs. ) | |
| ) | |
| Faegre Baker Daniels LLP, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter comes before the Court on Defendant's motion for summary judgment (Dkt. No. 43). For the reasons explained herein, the Court DENIES Defendant's motion.

## I. BACKGROUND

Defendant Berchtold Corporation ("Berchtold") supplies equipment and technology used in surgical suites to private hospitals, health care providers and governmental institutions. (Dkt. No. 5-2 at ¶ 5). On October 12, 2010, Berchtold salesman Michael Ward ("Ward") submitted a price quote to Lockheed Martin Services, Inc. ("Lockheed Martin") to supply surgical suite equipment to the Brooke Army Medical Center. (Dkt. No. 43-6 at 2). Ward emailed other Berchtold employees to inform them of the order, bragging about the potential profit margins under an "open market" price quote rather than the U.S. General Services Administrate ("GSA") price. (Dkt. No. 43-7 at 2–8).

Two weeks later, Nick Finlayson ("Finlayson"), a Procurement Buyer for Lockheed Martin, sent Ward a Request for Quotation ("RFQ"). (Dkt. No. 43-8 at 2). The RFQ states that "[i]f pricing for items contained in this solicitation is under a GSA contract/Federal Supply Schedule you are required to offer that FSA/FSS pricing in addition to pricing offered to Lockheed Martin." (*Id.* at 6). It also states that the supplier certifies that the prices quoted to

Lockheed Martin in the RFQ "are as low, or lower than that quoted to our most favored customer for like quantities under comparable conditions . . . and does not contain an element of profit in excess of that normally obtained by us on sales of products or services of like qualities and quantity." (*Id.* at 5). In his email accompanying the RFQ, Finlayson asked that Ward provide him "with a quote with your best pricing to the US Government" as well as "a copy of your Published Price List" so that Finlayson could "justify that the price offered by Berchtold is fair and reasonable." (*Id.* at 2).

Ward emailed various Berchtold employees about the RFQ—some expressed confusion as to why the prices Ward originally quoted did not reflect the "GSA contract pricing" and how Ward would "be able to realize the huge margins on this deal that [he] suggested in [his] earlier emails[.]" (Dkt. No. 43-7 at 11, 16). In response, Ward explained that Lockheed Martin is "fooked" and he is "doing what Haliburton does every day." (*Id.* at 12). He further explained that

> It is actually good that our contracts department is asleep at the wheel in this case. Most of the profit margin on this order is derived through line items like "Carbon Fiber and Spine Frames etc etc which "slipped through the cracks" when we re-upped our last GSA. So if this was truly a GSA purchase I couldn't sell half the stuff cause. . . . "the asleep at the wheel part would have burned me. . . ."

(*Id.* at 11). Ward responded to the RFQ using the same prices that were used in his October 12, 2010 quote. (Dkt. No. 43-12 at 5.) He completed the portion of the RFQ stating that the items were "open market," and wrote that Berchtold was selling the items at a 35% discount. (*Id.* at 3).

After conducting a price analysis, Finlayson emailed Ward, asking why the pricing on GSA Advantage indicated "much more favorable" GSA pricing than that offered on the RFQ. (Dkt. No. 43-13 at 2). Finlayson also asked for an invoice from a similar purchase order so that he could conduct a price comparison. (*Id.* at 8). Ward then emailed Finlayson an invoice that he

2

represented was from Kaiser Health System, but was in fact an invoice that Ward had manipulated to show fictitious prices and line items. (*Id.* at 12–13; Dkt. No. 43-15 at 5–6). On October 29, 2010, Lockheed Martin awarded the contract to Berchtold, delivering a purchase order ("PO 348") with a total value of $2,406,242. (Dkt. No. 5-2 at 17).

On November 7, 2010, after the contract was awarded but before it was fulfilled, Berchtold President Matt Wiesmiller ("Wiesmiller") emailed his friend, attorney Timothy Niednagel ("Niednagel") at Defendant Faegre Baker Daniels, LLP ("Faegre").[1] (*Id.* at ¶ 9). In this email, Wiesmiller stated,

> My team just did a deal to equip a USAF base, by selling through Lockheed Martin. The pricing is much better (for me) than my GSA contract pricing. I need someone to take a look at the whole situation and ensure I am not at odds with my GSA contract by booking this deal as is.

(*Id.*). Niednagel referred Weismiller to his law partner, Frank Swain ("Swain"). Swain testifies that Niednagel called him to make the referral and did not forward Weismiller's email to Swain nor communicate to him the contents of the email. (Dkt. No. 43-21 at 5). Swain further testifies that he spoke with Weismiller on the telephone and they discussed "whether . . . fulfilling this deal with Lockheed would contravene the terms of [Berchtold's] GSA agreement." (*Id.* at 7–8). According to Swain, Weismiller asked whether Berchtold was "able to do the deal with Lockheed Martin at higher than GSA pricing without violating [Berchtold's] GSA contract." (*Id.* at 9). After their phone conversation, Weismiller emailed Swain several documents including the Lockheed Martin purchase order; however, Wiesmiller did not send Swain the RFQ. (Dkt. No. 5-2 at ¶ 11). The purchase order reviewed by Swain references the RFQ for

---

[1] This contact was made with the firm Baker & Daniels, LLP. Effective January 1, 2012, Baker & Daniels LLP merged with Faegre & Bensen LLP to form Faegre Baker Daniels, LLP. (*Id.* at 4 n.1).

3

"specs and pricing" twenty-eight times. (*Id.* at ¶ 14). Swain never requested or reviewed the RFQ. (*Id.* at ¶¶ 18-19).

On November 11, 2010, Swain sent Wiesmiller a legal opinion letter addressing whether Berchtold's fulfilling of the purchase order "contravenes any conditions of [Berchtold's] currently effective Supply Schedule contract with the U.S. Department of Veterans Affairs (DVA) acting on behalf of the U.S. General Services Administration (GSA)." (*Id.* at 44). This letter stated, among other things, that "[b]ecause this agreement is not made by Brooke under the GSA contract, Berchtold is not required to charge the GSA contract price for those items on the GSA schedule. This letter reflects a summary review of the documents you have supplied. Should there by other relevant documents to review, . . . please bring the additional information to our attention immediately." (*Id.* at 45). Weismiller has testified that he relied on Swain's legal opinion in fulfilling the purchase order. (Dkt. No. 49-1 at 36).

On January 28, 2011, Lockheed Martin contacted Ward about problems it was having matching up the part numbers and quantities on the purchase order with the part numbers and quantities on the invoice delivered with the equipment. (Dkt. No. 43-28 at 4). Ward forwarded this email to several Berchtold employees including Sara Smith ("Smith"), in the Customer Service Department. (*Id.* at 3). Smith, copying other Berchtold employees, responded by email:

> I don't know how else to say this so I'm just going to throw it out there.
>
> Our invoices don't match their PO because you made up quite a few of the part #'s when you did the quote. Since your part #'s don't exist we had to use the actual correct part #'s when we booked and shipped the order.
>
> I'm not sure how to fix it.
>
> Seana – should we do a dummy invoice with incorrect prices so our invoice matches the PO?
>
> No clue what to do on this one!

4

(*Id.*). Seana Stewart, the Customer Service Manager, replied

> Let's take a look at the two. I think a dummy invoice will work for accounting purposes but not for actually receiving in the equipment especially if they are cross referencing the part numbers on the equipment to the invoice/pick list.

(*Id.* at 2). Three months later, Ward quoted two more tables to Lockheed Martin using the same pricing and same fake Kaiser invoice as before. (Dkt. No. 43-29 at 2–3).

In the spring of 2011, Berchtold became concerned that it had overcharged the federal government. (Dkt. No. 5-2 at ¶ 27). As a result of an internal audit process, Berchtold reported itself to the federal government and issued a refund of approximately $735,000, representing the amount over GSA pricing which it had charged for the surgical equipment at issue. (*Id.* at ¶ 29). A Berchtold contractor also brought a qui tam action against Berchtold, which included allegations that Berchtold knowingly submitted false information and fraudulent documentation in connection with the Lockheed Martin transaction. *United States of America et al v. Berchtold Corp.*, No. 2:11-cv-02601 (Dkt. No. 1).

Berchtold settled the False Claims Act ("FCA") portions of this suit for $3,600,000. (Dkt. No. 5-4). Berchtold also alleges that it paid its sales representatives $89,213.55 in commissions and bonuses that it would not have paid but for its reliance on the Faegre legal opinion. (Dkt. No. 5-2 at ¶¶ 26, 37). One week after the FCA settlement, the sole shareholder of Berchtold's parent company signed an agreement to sell all shares in the company to Stryker Corporation for $172,000,000. (Dkt. No. 43-2 at 31, 57–58). In addition to this litigation, Ward was indicted for his involvement with the Lockheed Martin transaction and pled guilty to one count of making and using a false document. *United States v. Ward*, No. 2:13-cr-00289 (D.S.C. 2013) (Dkt. No. 60).

5

Berchtold has brought a legal malpractice action against Faegre, asserting that Faegre's "inaccurate legal opinion regarding the pricing requirements" of the Lockheed purchase order led to the fulfillment of that purchase order and a "cascading parade of horrors." (Dkt. Nos. 5-2 ¶ 36; 49 at 1). Faegre argues that Berchtold's claim fails as a matter of law because the legal advice at issue was correct and did not proximately cause the harm alleged. (Dkt. No. 43-1 at 25–29). Faegre further argues that Berchtold is barred from recovering damages because Berchtold participated in the fraudulent conduct that caused the harm alleged. (*Id.* at 36). Berchtold responds that "[t]his action is rife with factual disputes" that preclude summary judgment. (Dkt. No. 49 at 1).

## II. LEGAL STANDARD

Summary judgment is appropriate if a party shows "that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his or her pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate that specific, material

facts exist that give rise to a genuine issue. *Id.* Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

## III. DISCUSSION

### A.   Validity of Faegre's Legal Advice

Faegre first argues that the legal advice it provided to Berchtold was correct, and, therefore, Faegre cannot be liable for legal malpractice as a matter of law. (Dkt. No. 43-1 at 25). Berchtold responds that there are "profound factual disputes surrounding this . . . issue," which precludes granting summary judgment. (Dkt. No. 49 at 30).

Under South Carolina law, a plaintiff in a legal malpractice action must prove: "(1) the existence of an attorney-client relationship; (2) a breach of duty by the attorney; (3) damage to the client; and (4) proximate cause of the client's damages by the breach." *Rydde v. Morris*, 675 S.E.2d 431, 433 (S.C. 2009). "In South Carolina, attorneys are required to render services with the degree of skill, care, knowledge, and judgment usually possessed and exercised by members of the profession." *Holy Loch Distribs., Inc. v. Hitchcock*, 531 S.E.2d 282, 285 (S.C. 2000).

Here, Faegre argues that it correctly advised Berchtold that its GSA contract did not require Berchtold to charge GSA prices in the Lockheed Martin transaction, and, therefore, Faegre did not breach its duty to Berchtold in rendering this advice. (Dkt. No. 43-1 at 29). In support, Faegre cites the deposition testimony of Finlayson, who testifies that PO 348 was an open market transaction and that GSA prices were not required. (Dkt. No. 50 at 4). Faegre contends that Berchtold's internal emails, as well as Berchtold's response to the RFQ, confirm that PO 348 was considered an open market transaction. (*Id.*). Fagre also cites the deposition

7

testimony of Berchtold's expert, John Howell, who acknowledges that he does "not per se" know anybody else who takes the position that PO 348 was a schedule contract[1] requiring GSA pricing. (Dkt. No. 49-13 at 18).

Faegre further contends that the legal opinion was correct given the scope of the question Weismiller asked of Swain, as confirmed by the opinion letter. (Dkt. No. 509 at 6). Specifically, the opinion letter states that "[y]ou have asked us to review whether Berchtold's fulfilling [of the purchase order ] . . . contravenes any conditions of [Berchtold's] currently effective Supply Schedule contract with the U.S. Department of Veterans Affairs (DVA) acting on behalf of the U.S. General Services Administration (GSA)." (*Id.* at 44). In his deposition, Weismiller agreed that this was the question "that he wanted answered." (Dkt. No. 43-2 at 26). Faegre asserts that "Swain did not need to see the RFQ to answer the question he was asked." (Dkt. No. 50 at 6).

Berchtold responds that it "was not interested in a 'view from space' analysis of its GS[A] contract. It was only interested in knowing whether it would be permissible to deviate from GSA scheduled pricing in the context of PO 348." (Dkt. No. 49 at 33). Indeed, Weismiller has testified that he asked Swain "for his review of the specific [GSA] contract and whether it could be accepted in the context of the GSA agreement." (Dkt. No. 49-1 at 50). According to Berchtold, the RFQ negated the issue of whether PO 348 was technically an "open market" or GSA contract, as the RFQ clearly required Berchtold to offer GSA pricing in addition to the pricing offered to Lockheed. (*Id.*). Berchtold contends that Swain's failure to review the RFQ despite the fact that it was mentioned twenty-eight times by PO 438, indicates that Swain "did

---

[1] "Schedule contract" means a contract that has been approved by the GSA to sell products, supplies, or services to the federal government. These contracts are subject to certain regulations, including GSA pricing. WELCOME TO GSA SCHEDULES, http://www.gsa.gov/portal/category/100615 (last visited Nov. 18, 2015).

not spend adequate time to appreciate the needs of his client and/or to analyze the situation that he was called upon to review." (*Id.*).

In support, Berchtold cites Howell's testimony that Swain's advice was "incomplete and incorrect." (Dkt. No. 49-13 at 8). Howell explained that the documents that Weismiller emailed to Swain should have put Swain "on notice" that Berchtold may have to offer Lockheed GSA pricing, and that Swain should have requested more materials, including the RFQ, to know for certain. (*Id.* at 15). Plaintiff's expert, Dr. Gregory B. Adams, opines that "any competent, diligent lawyer" would have requested and reviewed the RFQ and that Swain's legal advice was "incorrect, misleading, [and] incompetent." (Dkt. Nos. 49 at 22 n.6; 51-1 at 12); *see Philips v. Pitt Cnty., Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (holding that courts "may properly take judicial notice of matters of public record").

Having carefully reviewed the record, the Court finds that there is a genuine issue of material fact as to whether Swain breached its duty to Berchtold by failing to review the RFQ and advising Berchtold that it need not charge Lockheed GSA pricing. Even if the question asked of Faegre was exactly as stated in the legal opinion letter, the parties disagree as to the standard of care required to answer this question. Faegre contends that Swain only needed to examine the GSA contract and PO 348, whereas Berchtold contends that Swain also needed to review the RFQ. (Dkt. Nos. 43-1 at 28; 49 at 33). Here, Berchtold has submitted expert testimony that Swain's "duty of competence and the standard of care required him to ask for and review [the] RFQ." (Dkt. No. 51-1 at 13). Accordingly, the Court finds that Berchtold has submitted enough evidence through the statements of its experts to create a genuine issue of material fact as to the breach of duty.[2]

---

[2] Faegre relies on an out-of-circuit case to argue that the Court cannot rely on "unsupported opinion testimony" to create a genuine issue of material fact. (Dkt. No. 50 at 5).

9

### B.     Proximate Cause

Faegre next argues that it is entitled to summary judgment because Faegre's legal advice did not proximately cause the harm alleged by Berchtold. (Dkt. No. 43-1 at 29). Berchtold responds that the issue of proximate cause presents genuine issues of material fact to be resolved by the jury. (Dkt. No. 49 at 34).

Proximate cause requires proof of causation in fact and legal cause. *Sims v. Hall*, 592 S.E.2d 315, 320 (S.C. Ct. App. 2003). Causation in fact is proved by establishing the plaintiff's injury would not have occurred "but for" the defendant's negligence. *Id.* Legal cause is proved by establishing foreseeability. *Id.* When the injury complained of is not reasonably foreseeable, in the exercise of due care, there is no liability. *Eadie v. Krause*, 671 S.E.2d 389, 393 (S.C. Ct. App. 2008) (citing *Stone v. Bethea*, 161 S.E.2d 171, 173 (S.C. 1968)). "In the context of a legal malpractice action, the plaintiff bears the burden of proving the alleged malpractice proximately caused damage to plaintiff and the defendant may be held liable for anything which appears to have been a natural and probable consequence of his negligence." *Id.* (citing *Sims*, 592 S.E.2d at 320). "Generally, issues of foreseeability and proximate cause are questions for a jury." *Id.* at 393 n.5.

### 1.     "But For" Causation

The parties contend that the Court should use the "case-within-a-case" doctrine to determine whether Faegre's conduct was the "but for" cause of the alleged harm. (Dkt. Nos. 43-

---

The Court finds this argument meritless and notes that other courts in this district have relied on expert testimony to find a genuine issue of material fact as to a defendant's alleged breach of duty. *See Nelson Mullins Riley & Scarborough, LLP v. Aon Risk Servs. of New York*, No. 4:04-cv-21962, 2008 WL 3049850, at *9 (D.S.C. July 18, 2008) (finding "sufficient evidence to create issues of fact for a jury, precluding summary judgment as to whether defendants were negligent and breached their professional duties owed to plaintiff" based on expert testimony).

10

1 at 29; 49 at 34). Both parties cite Wilburn Brewer, Jr.'s article, *Expert Witness Testimony in Legal Malpractice Cases*, 45 S.C. L. Rev. 727 (1994). In this article, Brewer states that

> The case-within-a-case concept is often employed to explain the causal relationship between the attorney's breach of a duty and the harm suffered by the client. This concept is best illustrated using examples. For instance, if the client employs a lawyer to defend a case and the lawyer allows the case to go into default, arguably no harm occurred if the client had no available defense anyway and the judgment was justly entered. Another example is when an attorney is hired to represent an injured party in an automobile accident and, through neglect, the attorney allows the statute of limitations to run on the claim.
>
> . . .
>
> Under the case-within-a-case concept, the test is objective. Therefore, the test [] is not what the outcome would have been, but rather what it should have been. This is true whether the original trier of fact was a judge or jury. The accepted method of trying the case within the case is to prove what should have been proven in the underlying case. The judge in the malpractice case decides the issues of law, and the jury decides the issues of fact.

Brewer, *Expert Witness Testimony in Legal Malpractice Cases*, 45 S.C. L. Rev. 727 (1994).

Faegre argues that Berchtold cannot establish proximate cause under the case-within-a-case doctrine because if Berchtold's allegations in this case are assumed to be true, then Berchtold should have prevailed in the FCA action. (Dkt. No. 43-1 at 31). Faegre asserts that Berchtold should have successfully defended the FCA action by employing the advice of counsel defense, which requires that the defendant show the "(a) full disclosure of all pertinent facts to counsel, and (b) good faith reliance on counsel's advice." (*Id.*); *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 381 (4th Cir. 2015). According to Faegre, it "cannot be held liable for damages related to a case that Berchtold should have won as a matter of law. . . Either Berchtold relied on the advice of FaegreBD to its detriment and should have prevailed in the FCA case, or Berchtold did not have an advice of counsel defense, in which case the advice could not have caused the harm alleged." (*Id.* at 31–32).

11

This argument, however, misconstrues what a party must argue under the case-within-a-case doctrine. Here, the issue is not whether the qui tam would have been successful or not; rather, the issue is whether the qui tam action would have even occurred in the first place. In other words, the question is whether "but for" Faegre's legal advice, the alleged harm would have occurred. The Court finds that Faegre's arguments do not fit with the-case-within-a-case analysis and do not support finding a lack of proximate cause as a matter of law. Reasonable minds could disagree as to whether Faegre's alleged legal malpractice was the "but for" cause of the harm alleged. Accordingly, the Court will not grant summary judgment on this basis.

### 2. Foreseeability

Fagre also argues that the alleged harm was not reasonably foreseeable to Faegre at the time it gave its legal advice. (Dkt. No. 43-1 at 35). Faegre contends that the "natural and probable consequence of incorrect legal advice on whether Berchtold's pricing violated its GSA contract would be that Berchtold would have to refund the overcharge. . . . Honest pricing mistakes do not lead to criminal liability or liability under the FCA." (*Id.*). Faegre further asserts that Swain did not "have any information that would lead him to believe that Berchtold engaged in fraudulent conduct" and notes that Howell concedes in his deposition that it is not his "opinion that Frank Swain should have suspected that the [Lockheed Martin] transaction was tainted by fraud." (Dkt. Nos. 43-1 at 36; 50 at 9; 43-4 at 7).

In response, Berchtold points to an email Swain sent to Neidnagel on June 17, 2011, stating, "Someone who works for [Weismiller] just called me and said they had decided to go with another firm to resolve their GSA issues. . . . I think they [Berchtold] are actually in potentially really big trouble, and the solution won't be simple or inexpensive." (Dkt. Nos. 49 at

12

39; 49-19). Berchtold argues that this email indicates that Swain foresaw the potential consequences of his legal advice. (Dkt. No. 49 at 39).

Here, drawing all reasonable inferences in Berchtold's favor, the Court finds that reasonable minds could disagree as to whether the harm alleged was a natural and probable consequence of the alleged legal malpractice. *Eadie*, 671 S.E.2d at 393 n.5 ("Generally, issues of foreseeability and proximate cause are questions for a jury."). For example, it is unclear whether Swain's 2011 email is referring to the Lockheed Martin transaction and whether Swain discovered new information after he gave Berchtold legal advice in 2010. A jury could potentially resolve these issues in favor of Berchtold and find that Faegre proximately caused the harm alleged in this action.

### C.    *In Pari Delicto* Defense

Finally, Faegre argues that Berchtold cannot recover damages because it participated in the fraudulent conduct that caused the harm alleged, citing the doctrine of *in pari delicto*. (Dkt. No. 43-1 at 36). Berchtold contends that this doctrine is inapplicable here, or, alternatively, that applying the doctrine presents questions of fact that preclude awarding summary judgment to Faegre. (Dkt. No. 49 at 39–42).

*In pari delicto*, a common law doctrine that means "of equal fault," is "an affirmative defense that precludes a plaintiff who participated in the same wrongdoing as the defendant from recovering damages from that wrongdoing." *In re Derivium Capital LLC*, 716 F.3d 355, 367 (4th Cir. 2013) ("*In re Derivium*"); *see also In re Bogdan*, 414 F.3d 507, 514 (4th Cir. 2005); *Myatt v. RHBT Fin. Corp.*, 635 S.E.2d 545, 547 (S.C. Ct. App. 2006). "In South Carolina, this doctrine precludes one joint tort-feasor from seeking indemnity against another." *Myatt*, 635 S.E.2d at 547 (citing *Rock Hill Tel. Co. v. Globe Commc'ns, Inc.*, 611 S.E.2d 235, 237 n. 2 (S.C.

2005); *Atl. Coast Line R.R. Co. v. Whetstone*, 132 S.E.2d 172, 176 (S.C. 1963)). The *in pari delicto* defense is subject to an adverse interest exception. "Under the 'adverse interest' exception, the wrongs of an agent are not imputed to the principal if the agent acted adverse to the principal's interest." *In re Derivium*, 716 F.3d at 367.

Berchtold argues that the *in pari delicto* doctrine is inapplicable here because Berchtold and Faegre are not joint tortfeasors and could not be considered to have any type of conspiratorial relationship. (Dkt. No. 49 at 39–40). Faegre disagrees, citing *Myatt* to argue that South Carolina does not limit the doctrine to cases where the parties are joint tortfeasors. (Dkt. No. 50 at 11). In *Myatt*, however, the Court of Appeals of South Carolina merely extended the doctrine to find that a party could "assert the defense of *in pari delicto* against the receiver of a corporation that engaged in past wrongdoing." 635 S.E.2d at 547–48. *Myatt* does not stand for the proposition that South Carolina courts allow a party to assert the defense of *in pari delicto* in a legal malpractice action. Rather, the Court finds that this issue has not yet been addressed in South Carolina.

Other "[c]ourts have found that the *in pari delcito* doctrine bars a legal malpractice claim against an attorney where the plaintiff has knowingly or voluntarily violated the law and subsequently attempted to recover from his former attorney for advising him to violate the law or for failing to prevent him from doing so." *Stanley v. Trinchard*, 2010 WL 3168113, at *7 (E.D. La. Aug. 9, 2010); *see Whiteheart v. Waller*, 681 S.E.2d 419 (N.C. App. 2009) (plaintiff's malpractice action barred by defense of *in pari delicto* where plaintiff knowingly lied in an affidavit and knowingly spread lies about his competitor in a letter sent to the business community, despite allegations that attorney failed to advise plaintiff of the potential liability that could result from sending such a *per se* defamatory document); *Gen. Car & Truck Leasing Sys.,*

14

*Inc. v. Lane & Waterman*, 557 N.W.2d 274 (Iowa 1996) (plaintiffs' malpractice claim dismissed because they acted *in pari delicto* with defendant law firm in knowingly making false statements in affidavits submitted to Patent and Trademark Office); *Pantely v. Garris, Garris & Garris, P.C.*, 447 N.W.2d 864 (Mich. App. 1989) (plaintiff's malpractice action barred by defense of *in pari delicto* where the client perpetrated a fraud on the court by lying under oath about her residency status in a divorce action, even though she so testified upon advice of her attorneys); *Evans v. Cameron*, 360 N.W.2d 25 (Wis. 1985) (plaintiff's malpractice action barred by defense of *in pari delicto* where the client lied under oath in a bankruptcy proceeding about transferring money to her mother, even though she claimed her testimony was based upon the advice of her attorney). Notably, "some courts have distinguished between wrongdoing that would be obvious to the plaintiff and 'legal matters so complex . . . that a client could follow the attorney's advice, do wrong and still maintain suit on the basis of not being equally at fault.'" *Pantely*, 447 N.W.2d at 776.

South Carolina public policy indicates that the doctrine could be applicable to legal malpractice cases. Specifically, "[i]t is a well founded policy of law that no person be permitted to acquire a right of action from their own unlawful act and one who participates in an unlawful act cannot recover damages for the consequence of that act. This rule applies at both law and in equity and whether the cause of action is in contract or in tort." *Jackson v. Bi-Lo Stores, Inc.*, 437 S.E.2d 168, 170 (S.C. Ct. App. 1993) (citing 86 C.J.S. *Torts* § 12 (1954); 1A C.J.S. *Actions* § 29 (1985)). This "policy is reflected in the general rules providing that where parties are *in pari delicto*, that is, equally in the wrong, no affirmative relief will be given to one against the other and that no one shall be permitted to profit by his own wrong." 4 S.C. Jur. Action § 21.

While the Court finds that the *in pari delicto* doctrine may be applicable to legal malpractice cases under South Carolina law, it cannot resolve the issues on summary judgment. Disposing of this defense requires the Court to address questions of fact that will be resolved at trial. For example, Berchtold denies that there was any concerted effort to commit fraud and claims that it did not know that Ward had submitted fake invoices to Lockheed Martin. (Dkt. No. 49 at 2; 6). This raises the question of whether the adverse interest exception applies. In addition, the parties appear to dispute whether the legal advice Berchtold sought involved "legal matters so complex . . . that a client could follow the attorney's advice, do wrong and still maintain suit on the basis of not being equally at fault." *Pantely*, 447 N.W.2d at 776; Dkt. Nos. 43-1 at 41–42; 49 at 10). Such issues preclude granting summary judgment at this time based on the *in pari delicto* defense.

## IV. CONCLUSION

For the reasons stated herein, the Court finds that Berchtold's legal malpractice claim presents genuine issues of material fact as to whether Faegre breached its duty to Berchtold and whether this alleged breach proximately caused the harm alleged. The Court further finds that the *in pari delicto* defense also presents genuine issues of material fact that cannot be resolved at this stage of the litigation. Defendant's Motion for Summary Judgment (Dkt. No. 43) is therefore **DENIED**.

**IT IS SO ORDERED.**

Richard M. Gergel
United States District Judge

November 20, 2015
Charleston, South Carolina

17